IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA RIVER WATCH, a 501(c)(3) nonprofit, public benefit corporation,

    Plaintiff,

  v.

COUNTY OF SONOMA,

    Defendant.

No. C 14-00217 WHA

**ORDER DISMISSING FIRST AMENDED COMPLAINT**

## INTRODUCTION

In this action brought under Section 9 of the Endangered Species Act, defendant moves to dismiss and/or strike allegations in the first amended complaint. For the reasons stated herein, the first amended complaint is **DISMISSED WITHOUT PREJUDICE**. The County has voluntarily agreed to provided limited relief.

## STATEMENT

This action involves alleged violations of Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. 1531, *et seq.*, with respect to an alleged unauthorized "take" of the Sonoma County distinct population segment of the California tiger salamander ("Sonoma California tiger salamander").

In July 2002, the Fish and Wildlife Service listed the Sonoma California tiger salamander as endangered on a temporary emergency basis. *See* 68 Fed. Reg. 13498. In March 2003, the Fish and Wildlife Service upgraded the Sonoma California tiger

1  salamander's listing to full endangered status.  In August 2005, the Sonoma California tiger

2  salamander was reinstated as a distinct population and re-designated as endangered.  *Center for*

3  *Biological Diversity v. United States Fish & Wildlife Serv.*, No. 3:04-cv-04324-WHA, 2005

4  WL 2000928 WHA, at *17 (N.D. Cal. Aug. 19, 2005).

5       In December 2005, the County and City of Santa Rosa developed a Santa Rosa Plain

6  Conservation Strategy in order to manage areas within the Sonoma California tiger

7  salamander's critical habitat (First Amd. Compl. ¶ 14).

8       In May 2006, the United States Fish and Wildlife Services and the California Fish and

9  Wildlife Services issued Interim Mitigation Guidelines (Ball Decl. ¶ 4, Exh C).  The Interim

10 Mitigation Guidelines stated (emphasis added):

> The Interim mitigation guidelines shall apply to all projects that may result in "take" of the [California tiger salamanders] as defined in the federal ESA, including linear projects. Where appropriate, the [U.S. Army Corps of Engineers, U.S. Environmental Protection Agency, and North Coast Regional Water Quality Control Board] will also apply these guidelines, and local jurisdictions may apply these mitigation guidelines in connection with any evaluation performed under the California Environmental Quality Act.  Unless otherwise shown on the map attached to the Conservation Strategy as Figure 3, *mitigation for [California tiger salamanders] will be required for all projects within 1.3 miles of known breeding sites as long as the project site supports potential [California tiger salamander] habitat*.

18 To be clear, while the instant action is focused on the *Sonoma* California tiger salamanders, the

19 Interim Mitigation Guidelines appear to apply to all California tiger salamanders.  According to

20 the first amended complaint, the County blocked the conservation plan from implementation and

21 took little or no action to ensure the Interim Mitigation Guidelines were followed (First Amd.

22 Compl. ¶¶ 14, 15).

23       In September 2011, the Fish and Wildlife Service designated 47,383 acres of land

24 within Sonoma County as "critical habitat" for the Sonoma California tiger salamander.

25 *See* 76 Fed. Reg. 54346.

26       In October 2013, River Watch served the County with "Notice of Violations and Intent

27 to File Suit."  *See* 16 U.S.C. 1540(g)(2)(A).

28

2

In January 2014, plaintiff commenced the instant action. River Watch then served the County with a "Supplemental Notice of Violations and Intent to File Suit" in March 2014 (First Amd. Compl. Exhs. A, B).

In May 2014, plaintiff filed a first amended complaint (Dkt. No. 26). The sole claim for relief alleged was that the County is violating Section 9 of the ESA by (First Amd. Compl. ¶ 1) (emphasis added):

> aiding and facilitating the taking of [Sonoma California tiger salamander] by way of *issuing permits* authorizing activities which have caused and/or accelerated the decline of [Sonoma California tiger salamander], and/or delayed and/or prevented the recovery of [Sonoma California tiger salamander], likely jeopardizing its continued existence and leading to extinction.

Again, this action concerns members of the *Sonoma* County distinct population segment of the California tiger salamander (*ibid*.) (emphasis added). The first amended complaint seeks, *inter alia*, declaratory judgment to declare the County in violation of Section 9 of the ESA by authorizing a "take" and the following injunction:

> an order enjoining the COUNTY from issuing permits for development of land within 1.3 miles of known breeding sites, known occurrence and within habitat corridors of the designated critical habitat for [Sonoma California tiger salamander], unless the permittee is granted an incidental "take" permit under ESA § 10 and has satisfied all the requirements for surveys and mitigation as set forth in the ESA regulations and the Interim Mitigation Guidelines for the Santa Rosa Plain Conservation Strategy.

(*id*. at ¶¶ 28–29). On June 26, 2014, the hearing on the County's motion to dismiss was held. On July 1, the County filed a notice of supplemental authority, appending a copy of *Aransas Project v. Shaw*, No. 13-40317 (5th Cir. June 30, 2014) (Dkt. No. 38). On July 9, the County voluntarily agreed to provide limited relief (Dkt. No. 41). Plaintiff then filed a response (Dkt. No. 42). This order follows full briefing and oral argument.

**ANALYSIS**

**1. BROAD SWATH OF PERMITS.**

This civil action does not rely on Section 7, which requires *federal agencies* to confer with the Secretary on any agency action which is likely to jeopardize endangered species or result in an adverse modification of a "critical habitat" for an endangered species. 16 U.S.C.

3

1536. This is because Section 7 applies to federal agencies and this action is brought against the County of Sonoma.

This action is thus brought under Section 9 of the Endangered Species Act, 16 U.S.C. 1538. Section 9 makes it illegal for any private or public entity to "take" an endangered species. Specifically, Section 1538(a)(1)(B) of Title 16 of the United States Code makes it "unlawful for *any person . . .* to *. . . take* any such species within the United States or the territorial sea of the United States" (emphasis added). "The term '*take*' means to *harass*, *harm*, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. 1532(19) (emphasis added). The implementing regulation states:

> Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering . . .
>
> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. 17.3. Ordinarily a take occurs when an animal is killed or injured, but our court of appeals has held that a taking occurs when a habitat modification will significantly impair the breeding, feeding, or sheltering of a protected species. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996). This order, therefore, presumes that it would be illegal under Section 9 for a developer in Sonoma County to significantly impair the breeding, feeding, or sheltering of a protected species.

Nevertheless, this civil action does not challenge a specific land development project but rather broadly seeks to enjoin the County of Sonoma from issuing any and all land development permits without surveys and mitigation designed to protect the Sonoma County distinct population segment of the California tiger salamander, an "endangered species" designated under the Act. All takes allegedly caused by the County's land use permits are challenged (First Amd. Compl. ¶ 16):

> RIVER WATCH alleges the COUNTY causes or contributes to the destruction or degradation of critical habitat of the SCTS leading

4

> to a "take" by issuing permits for development without requiring compliance with surveys, consultations, or mitigations mandated under the ESA and required under the Interim Mitigation Guidelines within 1.3 miles of a known breeding site, known occurrence or within habitat corridors of the designated critical habitat. In some cases these COUNTY- approved projects have caused a direct "take". In other cases these COUNTY-approved projects have caused a "take" through significant adverse modification of critical habitat of the SCTS where the habitat degradation contributes to its decline, or prevents or delays its recovery or could result in extinction of the SCTS.

No specific permits, however, are identified. Indeed, the closest the first amended complaint ever comes to identifying specific permits is to cite general subject matters by example (First Amd. Compl. ¶¶ 19–22) (emphasis added):

> 19. *Permits issued by the COUNTY for industrial and residential development* in SCTS critical habitat within 1.3 miles of a known breeding site, a known occurrence and/or within critical habitat corridors have: allowed the clearing and development of land; destruction of vernal pools, wetlands, subsurface habitat including burrows and migratory pathways; and, interfered with feeding, breeding, migration and supportive biota. *Public projects including, but not limited to, infrastructure repair and replacement* initiated by the COUNTY within 1.3 miles of a known breeding site, a known occurrence and/or within critical habitat corridors are implemented without adequate mitigations, thereby also interfering with feeding, breeding, sheltering, migration and supportive biota. Projects permitted and conducted by the COUNTY have been inadequately mitigated and have failed to protect and maintain currently designated preserves.
>
> 20. The COUNTY grants *permits for agricultural and urban development* within 1.3 miles of a known breeding site, a known occurrence and within critical habitat corridors in the Conservation Area that create a high risk of harm and harassment of SCTS. *Such activities include permits to rip soils to six feet deep* in the absence of surveys for the presence of SCTS, in the absence of mitigations, without regard for loss of actual and potential migration corridors, loss of breeding habitat, loss of sheltering habitat, or loss of habitat needed for recovery efforts. Once the habitat is stripped and ripped, it is then common for the COUNTY to issue *permits which allow the use of pesticides, including herbicides and rodenticides, such as strychnine*, to kill burrowing rodents, insects, native plants and often non-targeted organisms. Destruction of burrows in upland habitats leave SCTS without shelter vital to their survival during long hot summer months. Destruction of certain plants and insects deprive SCTS of necessary food and shelter.
>
> 21. RIVER WATCH alleges the COUNTY has engaged in a "take" by the issuing of permits within 1.3 miles of a known breeding site, a known occurrence and/or within critical habitat corridors of the SCTS in the Conservation Area, which authorize

5

> *clearing, grading, ripping, vineyard development, use of chemicals such as pesticides and continue to damage critical habitat to the extent of interfering with the species' breeding, migration, feeding and sheltering as well as its eliminating supportive biota.*
>
> 22.   RIVER WATCH alleges the COUNTY has engaged in a "take" by the issuing of permits within 1.3 miles of a known breeding site, a known occurrence and/or within critical habitat corridors of the SCTS in the Conservation Area which authorize *clearing, grading, paving, construction and the destruction of vernal pools, burrows, and migratory pathways, and interfere with the species' feeding, breeding, migration and supportive biota.*

But even here, the first amended complaint does little more than refer generally to "infrastructure repair and replacement" projects, "permits . . . for industrial and residential development," "permits for agricultural and urban development," "permits to rip soils to six feet deep," and pesticides such as strychnine. The first amended complaint never identifies specific vineyard developments, deep-ripping projects, or pesticides permits. Moreover, the allegations concerning activities such as deep-ripping and pesticides appear as examples rather than concrete limits to the scope of this broad litigation.

The relief sought would include the following vast injunction (First Amd. Compl. ¶ 29):

> an order enjoining the COUNTY from issuing permits for development of land within 1.3 miles of known breeding sites, known occurrence and within habitat corridors of the designated critical habitat for SCTS, unless the permittee is granted an incidental "take" permit under ESA § 10 and has satisfied all the requirements for surveys and mitigation as set forth in the ESA regulations and the Interim Mitigation Guidelines for the Santa Rosa Plain Conservation Strategy.

In other words, all land-use permits within the designated geographic area would be suspended even though no concrete instance of a take is identified in the first amended complaint.

To repeat, this action does not challenge any specific permit or class of permits, but instead, more abstractly, alleges that Sonoma County allows land development projects within a designated geographic area without requiring mitigation and surveys that will avoid or reduce injury to protected species.

6

1   This order holds that this action is not yet ripe for adjudication. The three ripeness
2 factors are:

3
4
5
> (1) whether delayed review would cause hardship to the plaintiffs;
> (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

6 *Ohio Forestry Association v. Sierra Club*, 523 U.S. 726, 733–34 (1998). In *Ohio Forestry*
7 *Association*, the Supreme Court held that a generic challenge to a forest plan untethered to any
8 site-specific violation was not ripe for adjudication. The action was remanded with instructions
9 to dismiss. The plaintiff had alleged that the United States Forest Service's Land and Resource
10 Management Plan allowed too much logging and clear-cutting in Ohio's Wayne National Forest.
11 *Id.* at 728. The Land and Resource Management Plan did not itself authorize the cutting of any
12 trees — it merely set logging goals, selected the areas suited to timber production, and
13 determined which probable methods of timber harvest were appropriate. Before the Service
14 could permit logging, however, the project had to pass a multi-step permitting process, which
15 parties could challenge in administrative and court appeals. *Id.* at 734. Plaintiff thus had "ample
16 opportunity to bring its legal challenge at a time when harm [was] more imminent and more
17 certain." *Id*. at 734.

18   Although our court of appeals has not yet applied the *Ohio Forestry* factors to dismissal
19 of a Section 9 action like this one, it has stated that "harm is best assessed when it is tangible
20 rather than theoretical." *Wilderness Society v. Thomas*, 188 F.3d 1130, 1133–34 (9th Cir. 1999).
21 In *Thomas*, our court of appeals found that the environmental groups' general challenge that the
22 United States Forestry Service violated the National Forest Management Act was not justiciable
23 but claims at the site-specific level were justiciable.

24   Applying these factors, this order holds that this action is not yet ripe for review in
25 federal court. *First*, delaying review until California River Watch finds a specific, concrete
26 instance of a "take" would not cause hardship but would rather allow for the development of
27 specific facts. *Second*, immediate judicial review directed at all land-use permits would hinder
28 the County's efforts regarding the permitting process. Nothing in the record suggests that

7

plaintiff has pursued administrative action, such as participating at a public hearing for proposed land use permits. Nor does the record suggest that plaintiff has participated at the public meetings of the Santa Rosa Plain Conservation Strategy Implementation Committee, and indeed, the Santa Rosa Plain Conservation Strategy was never implemented (First Amd. Compl. ¶ 14; Ball Decl. Exh. B at 51). It would be premature to have judicial review of the County's permit procedure before concrete permits resulting in a probable "take" are identified. Even though plaintiff argues in its brief that a "developer could proceed with his conversion project during the notice period causing irreparable harm to critical habitat before River Watch could file a complaint," at this point this is mere speculation without any specifics (Dkt. No. 42).

California River Watch has recently brought a different action over a specific permit, so that certainly can be done. In the recent *California River Watch v. Castaneda, et al.*, No. 3:13-cv-01700-WHA (N.D. Cal. Apr. 15, 2013), plaintiff sued and received relief by a consent decree.

At oral argument, California River Watch stated that it brought this action against the County rather than an individual developer because it "would like to see a larger resolution rather than a piecemeal resolution." The Supreme Court, however, has stated:

> in any event, the [Supreme] Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe. The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of — even repetitive — postimplementation litigation.

*Ohio Forestry*, 523 U.S. at 735. Here, this action as framed is too abstract to justify review at this time.

*Third*, this action would benefit from further factual development. As stated above, no specific permits or projects were identified in the first amended complaint. Without concrete facts to grasp, this action would devolve into a speculative exercise.

Accordingly, this order holds that there is no ripe case or controversy and that the action should be **DISMISSED WITHOUT PREJUDICE** to re-filing a new lawsuit when a specific project is approved (or liable to be approved) within the critical habitat and within 1.3 miles of known

8

1  breeding sites, known occurrence and within habitat corridors of the designated critical habitat
2  for Sonoma California tiger salamander.

3  \*  \*  \*

4  California River Watch's reliance on two out-of-circuit decisions — for the proposition
5  that county agencies can be liable for regulatory failures that result in a "taking," even if that
6  taking is directly caused by the action of a regulated party — is misguided here. In *Strahan v.*
7  *Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997), the First Circuit stated that the ESA "not only
8  prohibits the acts of those parties that directly exact the taking, but also bans those acts of a
9  third party that brings about the acts exacting a taking." The Massachusetts Division of Marine
10 Fisheries caused the taking of endangered whales when it licensed commercial fishing operations
11 to use gillnets and lobster pots that were likely to harm the whales. The preliminary injunction,
12 which was affirmed, did not order defendants to make specific modifications to its licensing
13 scheme, but rather, *inter alia*, required defendants to "convene an Endangered Whale Working
14 Group and to engage in substantive discussions . . . regarding modification of fixed-fishing gear
15 and other measures to minimize harm to the Northern Right whales." *Id*. at 158. *Coxe*, unlike
16 this action, involved specific licenses for gillnets and lobster pots. Our action is not so
17 constrained for it seeks to reach all land-use permits issued by Sonoma County.

18 Similarly, in *Loggerhead Turtle v. Council of Volusia County*, 148 F.3d 1231, 1253, 1258
19 (11th Cir. 1998), the Eleventh Circuit found that plaintiffs had standing to challenge Volusia
20 County's artificial lighting ordinance based on allegations that the allegedly unlawful take by
21 third-party owners of artificial beach lights could be fairly traceable to "'harmfully' inadequate
22 regulation of artificial beachfront lighting." *Id*. at 1249. Whether the County was actually in
23 violation of the ESA, however, remained for after remand. On remand, the district court found
24 that the beachfront lighting ordinance did not cause harm to the sea turtles. *See Loggerhead*
25 *Turtle v. County Council of Volusia County*, 92 F. Supp. 2d 1296, 1305–08 (M.D. Fla. 2000)
26 (Judge Anne Conway). "The question presented here is whether Volusia County's ordinance,
27 which is aimed at protecting the turtles, violates the Act by causing takings thereunder. The
28 answer is no. The true violators, the persons responsible for illuminating the beaches, are not

9

before this Court." *Id*. at 1308. "Volusia County cannot be made to assume liability for the act of its private citizens merely because it has chosen to adopt regulations to ameliorate sea turtle takings." *Ibid*. Here, however, California River Watch does not challenge a specific ordinance for a specific activity but rather seeks a blanket order enjoining Sonoma County from issuing all land-use permits without restrictions and mitigation designed to protect the Sonoma California tiger salamander. The broad scope contemplated by the first amended complaint is too abstract as styled.

The closest action like the one brought by California River Watch here is *Seattle Audubon v. Sutherland*, No. 2:06-cv-01608-MJP, 2007 WL 1300964, at *6–7 (W.D. Wash. May 1, 2007) (Judge Marsha Pechman). In *Seattle Audubon*, the court found ripe for review the plaintiffs' "take" claim against various state agencies for authorizing logging that allegedly resulted in a "take" of the spotted owl. There, however, plaintiffs' claims "[were] not a facial attack on a broad management plan" like in *Ohio Forestry* and plaintiffs had "alleged past ESA violations as well as ESA violations that [were] underway and ongoing and [had] pointed out specific owl circles that [were] threatened by the State's practices." *Id.* at * 7. Plaintiff also sued a specific entity, the Weyerhauser Company. After evidence was presented, no preliminary injunction was granted against the state defendants, but a limited preliminary injunction was granted against the Weyerhauser Company from further logging within the 2.7 mile radius circle around four specific owl site centers. *Seattle Audobon Society*, No. 2:06-cv-01608-MJP, 2007 WL 2220256, Dkt. No. 224 at *25. The parties eventually settled. In our action, however, California River Watch has not identified any specific sites, projects, or permits rendering the action much more abstract than in *Seattle Audubon*.

California River Watch argues that a similar injunction was granted in *Aransas Project v. Shaw*, 930 F. Supp. 2d 716, 775 (S.D. Tex. 2013), where Judge Janis Jack ordered the Texas Commission on Environmental Quality to seek an incidental take permit and suspend issuing new water-use permits. That decision, however, was reversed. In *Aransas Project v. Shaw*, 13-40317, 2014 WL 2932514 at * 15 (5th Cir. June 30, 2014), the district court's injunction was reversed because the court found that the state agency was not the proximate cause of a "take" of

10

1  the whooping crane for its permitting and regulation of fresh water use where the causal chain
2  was "so attenuated that the consequence [was] more aptly described as mere fortuity." *Id.* at
3  *13, 17 (internal citations omitted). The plaintiff did not meet its burden of proving that the
4  whooping crane deaths were a "reasonably foreseeable" result of the agency's water-permitting.
5  *Id.* at * 15. It is difficult to see how our plaintiff could achieve the vast injunction requested
6  without identifying specific permits or sites.

**2.     NOTICE.**

Pursuant to Section 1540(g) of the ESA, a citizen may not bring suit until sixty days after written notice of an alleged violation has been given to the Secretary and to the alleged violator. 16 U.S.C. 1540(g)(2)(A)(i). "The purpose of this notice is to give the federal government and any alleged violators an opportunity to comply, and thus render a citizen suit unnecessary." *Marbled Murrelet*, 83 F.3d at 1072. The notice requirement is thus jurisdictional. *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).

In *Southwest Center for Biological Diversity*, our court of appeals held that the plaintiff failed to sufficiently alert the defendant to the actual violation alleged in the complaint. The notices alleged violations within the region of the "Lower Colorado River," but the complaint alleged "takes" at the Flycatcher songbird habitat at the Lake Mead Delta. *Id.* at 522–23. Although the notice:

> was not required to list every specific aspect or detail of every alleged violation relied upon in the complaint or to describe every ramification of every alleged violation . . . [a]t a minimum, [plaintiff] was obligated to provide sufficient information of a violation so that the [defendant] *could identify and attempt to abate the violation*.

*Id.* at 522 (emphasis added).

Similarly, in *Center for Biological Diversity v. Chertoff*, No. 3:08-cv-02999-MMC, 2009 WL 839042, at *4 (N.D. Cal. Mar. 30, 2009) (Judge Maxine Chesney), the notice was deficient for part of the action. The notice stated that plaintiff intended to bring an action "over violations of Sections 2, 7, and 9 of the [ESA] for actions and inactions related to the management and regulation of ship traffic in the Santa Barbara Channel and *elsewhere along the California*

11

1  *coast*." *Id*. at *4 (emphasis added). The court found that the notice regarding the Santa Barbara
2  Channel was sufficient, but the notice's general reference to "the California coast" did not
3  extend to violations in San Francisco and "Los Angeles – Long Beach."
4        Here, California River Watch's two notices failed to provide sufficient information for
5  the County to identify or attempt to abate the alleged violation. *See Southwest Center for*
6  *Biological Diversity*, 143 F.3d at 522. The Supplemental Notice did not point to any specific
7  geographic location or specific class of permits that the County could then investigate and bring
8  into compliance, if necessary. The Supplemental Notice stated:

> Permits issued by the County that allow land disturbance activities
> such as grading and deep ripping of land, the use of pesticides
> including rodenticides, industrial and residential development,
> all constitute a take of [Sonoma California tiger salamander]
> since these activities interfere with the species' feeding, breeding,
> migration and supportive biota.

(First Amd. Compl. Exh. B at 4). The Supplemental Notice failed to identify a geographic location other than the Sonoma California tiger salamander's critical habitat referenced in passing: "due to backlash from developers and other special interests, the [critical habitat] acreage has now been reduced to only 47,383 (September 30, 2011)." *Id*. at 3. (The County has stated that "[t]he 47,383 acres equate to 74 square miles and are roughly the same size as the City of Oakland" (Reply 12, n.7).) This does not provide sufficient information of a violation so that the County can identify and attempt to abate it.

      Moreover, the County contends that there is a disconnect between the 47,383 acres referenced in the Supplemental Notice and the "1.3 miles of a known breeding site, known occurrence, and/or within critical habitat corridors" referenced in the first amended complaint (First Amd. Compl. ¶ 19). The first amended complaint never called out the 47,383 acres referenced in the Supplemental Notice. *Indeed, it was not until oral argument that plaintiff's counsel limited the scope of the first amended complaint to the 47,383 acres of land designated as critical habitat for the Sonoma California tiger salamander and, even further, to those lands therein that fall within 1.3 miles of known breeding sites, known occurrence, and habitat corridors of the designated critical habitat for the Sonoma California tiger salamander.* This limitation was not previously delineated in the first amended complaint or statutory notices.

12

1  To wait until oral argument to clarify the intended geographic scope of the notice and lawsuit is

2  too little, too late. The notices were inadequate to support subject-matter jurisdiction over this

3  civil action.

4      **3.**     **OTHER PENDING MOTIONS.**

5  The County also moves to strike certain allegations in the first amended complaint and

6  for judicial notice of seven documents. FRE 201(b). The request for judicial notice of Exhibit C

7  of the Declaration of Verne Ball is **GRANTED**. The other exhibits are not relied upon, and

8  accordingly, the remainder of the request is **DENIED AS MOOT**. Due to the other fundamental

9  problems with the first amended complaint, the motion to strike is **DENIED AS MOOT**.

10 **CONCLUSION**

11 For the reasons stated herein, this first amended complaint cannot proceed. Leave to

12 amend would be futile. Nonetheless, the County has agreed to the following:

> the County is willing to provide Plaintiff (and the public) with additional notice of all permits contemplating development within the designated [California tiger salamander] habitat area by implementing a weekly online report, accessible by the public (including Plaintiff) and the relevant permitting and enforcement agencies, listing any new development permits issued by the County in the [California tiger salamander] critical habitat area . . . The County will need approximately 90 days to implement this weekly database report. In the interim, if Plaintiff so requests, the County will provide Plaintiff with copies of vineyard development permits . . . within seven days of their issuance.

19 (Dkt No. 41 at 4). In addition, the County has also pointed plaintiff to four existing resources for

20 discovery of issued permits and some pending permit applications: (1) the County's "Permits

21 Plus" database; (2) open meetings for the Board of Zoning Adjustment, Planning Commission,

22 or Board of Supervisors; (3) notice provided under the California Environmental Quality Act;

23 and (4) notices of discretionary use permits sent to landowners within 300 feet of the applicant's

24 property and upon request (*id.* at 2–3). Plaintiff responds that searching the Permits Plus

25 database requires providing an address or parcel number rendering it difficult to identify which

26 permits deal with the Sonoma California tiger salamander critical habitat. This problem is

27 alleviated by the County's promise to implement a weekly online report listing any new

28

development permits issued by the County in the California tiger salamander critical habitat. This order requests that the County honor its word and supply the notice to plaintiff as requested.

Based on the County's representations, plaintiff should be able to solve the ripeness problem and bring concrete controversies rather than abstract propositions. This dismissal is without prejudice to any such future litigation.

**IT IS SO ORDERED.**

Dated: July 10, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE